IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,
       Plaintiff,

     v.                     CRIMINAL NO.:  WDQ-13-0662

NIKOLAY ZAKHARYAN, *et al.*,
       Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Nikolay Zakharyan ("N. Zakharyan")[1] is charged with conspiracy to traffic in contraband cigarettes[2] and trafficking in contraband cigarettes.[3] ECF No. 214. Pending are N. Zakharyan's pretrial motions.[4] A hearing was held on April 2, 2015. ECF No. 243. For the following reasons, N. Zakharyan's

---

[1] Because many of the alleged parties to the cigarette trafficking scheme underlying these charges have the same last name, the defendant, and others, will be referred to by their first initial and last name.

[2] 18 U.S.C. § 371(2012).

[3] 18 U.S.C. § 2342(a)(2012).

[4] Trial is scheduled to begin on April 20, 2015. This Memorandum Opinion resolves motions made or adopted by N. Zakharyan.

N. Zakharyan has moved to adopt pertinent co-defendant motions. ECF No. 158. His motion to adopt requests procedural relief (i.e., permission to adopt the co-defendant's motion) that will be granted. The substantive relief sought by the co-defendant's motion and N. Zakharyan's adopted motion will be denied.

motion to adopt pertinent co-defendant motions will be granted;
all other motions will be denied.

I.   Background

    A.   Facts[5]

        1. Overview of the Crime

This case arises from a contraband cigarette[6] trafficking
scheme allegedly involving N. Zakharyan and others.   ECF No.
214.[7]   In March 2009, the Baltimore County Police Department
("BCPD") received tips from two "concerned citizens" that
businesses owned by three brothers--Elmar Rakhamimov, Timur
Yusufov, and Salim Yusufov--had been engaging in criminal

---

[5] The facts are from the indictment, relevant papers, attached
exhibits, and the rough transcript of testimony at the motions
hearing.

[6] The term "contraband cigarettes" means a quantity of cigarettes
"in excess of 10,000 cigarettes, which bear no evidence of the
payment of applicable State or local cigarette taxes in the
State or locality where such cigarettes are found, if the State
or local government requires a stamp, impression, or other
indication to be placed on packages or other containers of
cigarettes to evidence payment of cigarette taxes."   18 U.S.C.
§ 2341(2).   Maryland and New York require tax stamps on packages
as evidence of payment of state cigarette taxes.   ECF No. 214
¶ 7.

[7] The original indictment charged Salim and Timur Yusufov, Elmar,
Ilgar, and Yuliya Rakhamimov, Zarakh Yelizarov, Adam Azerman,
Shamil Novakhov, Ruslan Ykiew, and Artur Zakharyan with various
offenses, including conspiracy to traffic in contraband
cigarettes, trafficking in contraband cigarettes, distribution
of oxycodone, money laundering, and sale of a drug sample.   ECF
No. 1.   Those defendants' cases have been resolved through plea
agreements, deferred prosecution agreements, or dismissal.   *See*
ECF Nos. 123, 139, 143, 190, 191, 201, 212, 218, 229, 241.

activity.  ECF Nos. 209 at 2; 209-2 ¶ 35.[8]  The concerned
citizens reported that Healthway Pharmacy, owned by S. Yusufov,
had been receiving and distributing FDA-banned drugs from
Russia, and committing healthcare fraud. ECF No. 209 at 2.

In May 2009, a confidential informant ("CI #5631") told
BCPD Detective Ryan Cooper that S. Yusufov obtained banned
Russian medications from a source in New York and sold them at
Healthway Pharmacy.  *Id*. at 3.  According to CI #5631, S.
Yusufov had been billing Medicaid and Medicare for unfilled
prescriptions.  *Id*.

In July 2010, the FBI had a confidential human source
("CHS-1") approach S. Yusufov at Healthway Pharmacy to assess
the scope of criminal activity.  *Id*.; ECF No. 209-2 ¶ 40.  On
July 23, 2010, CHS-1 visited the pharmacy to fill prescriptions.
ECF No. 209 at 4.  CHS-1 asked S. Yusufov for Corvalol, an
unapproved Russian drug, instead of one of his prescribed
medications.  *Id*.  S. Yusufov gave CHS-1 Corvalol and billed
Medicaid for the unfilled prescription.  *Id*.[9]

---

[8] Those businesses included, among others, Europe Restaurant and
Healthway Pharmacy in the Pikesville area of Baltimore County.
ECF No. 209 at 2 n.1.  In 2006, the BCPD and the Federal Bureau
of Investigation ("FBI") investigated Europe Restaurant for
receipt of stolen goods, distribution of cocaine, and unlawful
firearms possession.  *Id*. at 2-3.

[9] On five occasions from July 2010 to July 2011, S. Yusufov gave
CHS-1 Corvalol instead of his prescribed medication, and billed
Medicare or Medicaid.  *Id*. at 4.

On July 24, 2010, CHS-1 visited Europe Restaurant to develop personal ties with S. Yusufov. *Id*.  S. Yusufov asked CHS-1 and his friends what they did for a living.  *Id*.  One friend replied that he was a jeweler; another that he was a real estate agent.  *Id*. at 5.  S. Yusufov asked CHS-1 if he was a "mobster."  *Id*.  CHS-1 replied, "[n]o, I'm just a businessman." *Id*.  S. Yusufov said, I'm a businessman like you," took CHS-1's phone number, and said they would be best friends.  *Id*.

In August 2010, S. Yusufov gave CHS-1 the name of a physician who "would give him *whatever he wants*."  *Id*.  Later that month, S. Yusufov asked CHS-1 what kind of business he was in.  *Id*.  CHS-1 replied, "Export-Import," to which S. Yusufov responded, "What do you export?  Tell me.  We'll make some extra money."  *Id*.  CHS-1 said he would "talk to [him] later."  *Id*.

On August 25, 2010, S. Yusufov told CHS-1 that he obtained Russian drugs from New York.  *Id*.  Over lunch, CHS-1 told S. Yusufov that he had been involved in trucking and loan sharking, but now has a source for Medicaid cards.  *Id*.  S. Yusufov responded that using fake Medicaid cards "was fraud," but that "an easy fraud scheme" involved buying and selling prescription drugs for a profit.  *Id*.  When they next met, S. Yusufov told CHS-1 that using Medicaid cards was not a good idea, in part, "because they couldn't make 'big money.'"  *Id*.  S. Yusufov and

4

CHS-1 discussed meeting later in the week; afterward, S. Yusufov called CHS-1 twice to arrange the meeting. *Id.*

On October 9, 2010, CHS-1 visited Europe Restaurant with his family while S. Yusufov was there. *Id.* at 6. When CHS-1 and S. Yusufov went outside to talk, S. Yusufov asked CHS-1 if he dealt in drugs. *Id.* CHS-1 stated that he dealt in alcohol and cigarettes, not drugs. *Id.* S. Yusufov told CHS-1 that he would introduce him to a "connected" figure in Baltimore's Russian community. *Id.*[10]

On October 15, 2010, S. Yusufov introduced CHS-1 to a liquor storeowner who wanted to buy untaxed alcohol. *Id.* When they left the store, S. Yusufov complained to CHS-1 about needing money. *Id.* S. Yusufov also told CHS-1 that his brother, E. Rakhamimov, had buyers for untaxed cigarettes and liquor. *Id.* S. Yusufov wanted to arrange a meeting with CHS-1 and E. Rakhamimov at Europe Restaurant the next day; however, S. Yusufov was concerned about maintaining his role as middle man. *Id.* at 6-7.

On October 19, 2010, CHS-1 and S. Yusufov met at Healthway Pharmacy and discussed contraband cigarette transactions. *Id.* at 7. S. Yusufov asked what brand of cigarettes CHS-1 would provide, and suggested that he had a New York buyer and that E. Rakhamimov had discussed becoming involved in the transactions.

---

[10] This conversation was not recorded. ECF No. 235 at 3.

*Id.*   Less than a week later, S. Yusufov told CHS-1 that he had another buyer for untaxed alcohol.   *Id.*

On October 30, 2010, CHS-1 met S. Yusufov and E. Rakhamimov at Europe Restaurant to discuss cigarette and alcohol transactions.   *Id.*   E. Rakhamimov said he was interested in both, and asked CHS-1 for his phone number.   *Id.*   CHS-1 privately told S. Yusufov that he would receive a $200 kickback for each case of cigarettes CHS-1 supplied.   *Id.*

On December 13, 2010, S. Yusufov told CHS-1 that he was ready to receive the cigarettes, and described another scheme involving bottled water.   *Id.*   S. Yusufov told CHS-1 "you need to engage in criminal activity in the U.S. in order to stay in business and make money."   *Id.*

On February 18, 2011, CHS-1 visited Healthway Pharmacy to collect a prescription.   *Id.* at 8.   S. Yusufov asked him when they were going to do business together, and complained that people he had told about the cigarettes "were beginning to think he [was] a 'bullshitter.'"   *Id.*   Four days later, S. Yusufov again asked CHS-1 about the cigarettes; CHS-1 replied that "he had lost the ability to move the product, but that he was working on it."   *Id.*

On July 14, 2011, CHS-1 told S. Yusufov that he was ready to begin the cigarette operation.   *Id.*   S. Yusufov asked for

samples and said that his brother and another buyer were
interested.  *Id.*

On July 18, 2011, CHS-1 met S. Yusufov at Europe
Restaurant.  *Id.*  According to S. Yusufov, E. Rakhamimov had
lost interest in buying the cigarettes.  *Id.*  S. Yusufov asked
if the cigarettes could be delivered to New York, and how much
money he would make per case.  *Id.*  S. Yusufov also offered to
introduce CHS-1 to someone who dealt in stolen or counterfeit
watches.  *Id.* at 8-9.

On August 17, 2011, S. Yusufov arranged a meeting between
CHS-1 and a cigarette buyer.  *Id.* at 9.  The prospective buyer
took samples of the cigarettes but never initiated any orders.
*Id.*

On October 24, 2011, CHS-1 gave samples to S. Yusufov for
another interested buyer.  *Id.*  On October 28, 2011, S. Yusufov
told CHS-1 that the new buyer was very serious but wanted more
samples.  *Id.*  S. Yusufov said that he wanted to buy 200 cases
for the new buyer, which would be delivered to New York.  *Id.*
CHS-1 responded that 200 cases would be too many for the first
deal, but S. Yusufov insisted.  *Id.*

On November 10, 2011, CHS-1 gave S. Yusufov additional
cigarette samples and said that he would supply 20 cases for the
first deal.  *Id.*

On November 19, 2011, CHS-1 met the "new" buyer--E. Rakhamimov--at Europe Restaurant.  *Id*.[11]  E. Rakhamimov told CHS-1 that he wanted 20 master cases[12] of Parliament 100 brand cigarettes, which would sell for $45 per carton in New York. *Id*. at 9-10; ECF No. 209-2 ¶ 47.[13]

From December 7, 2011 to November 7, 2013, 18 cigarette transactions occurred, ranging from 20 to 500 cases per transaction.  ECF No. 209 at 10-11.[14]  On December 7, 2011, CHS-1 delivered the first batch of 20 cases to Chesapeake Monuments, an Owings Mills, Maryland business owned by E. and I. Rakhamimov.  *Id*. at 10.[15]  Thereafter, CHS-1 delivered the cigarettes to E. Rakhamimov's home.  *Id*. at 11.

---

[11] *See* also ECF No. 214 ¶ 18(a).  This meeting was not recorded. ECF Nos. 209-2 ¶ 47; 235 at 3.

[12] A master case contains 30 or 60 cartons of cigarettes, depending on the brand.  ECF No. 209 at 8 n.9.  Each carton has ten packs of 20 cigarettes.  *Id*.

[13] *See also* ECF No. 214 ¶¶ 18(a)-(aaa).  E. Rakhamimov paid $30 per carton; over time, E. Rakhamimov paid CHS-1 about $5.4 million for the contraband cigarettes.  *Id*. ¶ 4.

[14] Every transaction was audio and video recorded.  ECF No. 209 at 11.  Along with CHS-1, an undercover FBI agent was present at every transaction except the first.  *Id*.

[15] On February 22, 2012, after the third cigarette transaction, CHS-1 and UCE-4815 met S. Yusufov at Healthway Pharmacy to provide him with an $8,200 "kickback" from the transaction.  *Id*. at 16.  CHS-1 complained that E. Rakhamimov had requested samples even though he had already purchased cases of cigarettes.  *Id*.  S. Yusufov told CHS-1 to "[c]hill."  *Id*.  When

At some time, E. Rakhamimov expressed interest in importing
or exporting shipping containers of contraband cigarettes with
the assistance of corrupt Newark, New Jersey customs officials,
and in supplying CHS-1 and undercover agents[16] with black market
drugs.  ECF No. 209-2 ¶ 53.

Before each delivery, E. and I. Rakhamimov and A. Zakharyan
discussed the transaction over the telephone and in person, and
met at E. Rakhamimov's home to compile and count the money for
the cigarettes.  ECF No. 209 at 11.  After the deliveries, they
met at E. Rakhamimov's house or Europe Restaurant to discuss
transporting the cigarettes to New York.  *Id.*

From December 2011 to June 2012, R. Ykiew--S. Novakhov's
nephew--drove the cigarettes to New York, where they were sold
to S. Novakhov.  *Id.* at 12-13.[17]

Beginning in May 2012, A. Zakharyan had N. Zakharyan attend
and assist with the deliveries.  *Id.* at 12.  In addition to
participating in the purchases,[18] N. Zakharyan moved the
cigarettes from the delivery truck into E. Rakhamimov's garage,

---

CHS-1 responded, "[h]uh?,"  S. Yusufov again told CHS-1 to
"[c]hill," and stated "Yeah, we are Russian mafia."  *Id.*

[16] CHS-1 introduced E. Rakhamimov to two FBI undercover agents:
UCE-3281 and UCE-4815.  ECF No. 209-2 ¶ 53.  UCE-3281 posed as
the "primary supplier and boss."  *Id.*

[17] Beginning in August 2012, A. Zakharyan's contact, Azerman,
drove the cigarettes to New York.  *Id.* at 13.

[18] *See, e.g.*, ECF No. 214 ¶ 18(p).

ensured the correct number and type of cigarettes had been
delivered, and wrapped the cases in black trash bags to cover
the markings. *Id.* at 12.  N. Zakharyan also loaded the
cigarettes for transport to New York.  *Id.*

In May or June 2012, UCE-3281 asked E. Rakhamimov to
provide Oxycodone as partial payment for the cigarettes. *Id.* at
13.  On June 12, 2012, E. Rakhamimov told CHS-1 that he had a
source of legitimate and fake Ukranian pharmaceuticals. *Id.*  In
September 2012, E. Rakhamimov gave CHS-1 fake Viagra drugs to
present to UCE-3281 for approval, and said that he was looking
into obtaining Oxycodone.  *Id.*  E. Rakhamimov worked with A.
Zakharyan to further the drug scheme.  *Id.* at 14.  From
September 2012 to October 2013, about 3,000 Oxycontin pills, 500
Oxycodone pills, and 10,000 fake Cialis and Viagra pills were
provided as partial payment for the contraband cigarettes.  ECF
No. 209-5 at 25.[19]

---

[19] On January 16, 2013, four men carjacked, kidnapped, and robbed
the son of the owner of Antony Jewelers, located in Owings
Mills, Maryland.  ECF No. 209 at 15.  The robbers forced the
victim to provide the jewelry store's alarm codes; thereafter,
they entered the store and stole about $450,000 in jewelry. *Id.*
On January 17, 2013, E. Rakhamimov told CHS-1 that he had a
million dollars' worth of "hot" jewelry.  *Id.*  On January 18,
2013, CHS-1 went to E. Rakhamimov's home to inspect the jewelry.
*Id.*  "S.Y.," Yelizarov's son, was at E. Rakhamimov's home.  *Id.*
S.Y. and E. Rakhamimov wore gloves while showing CHS-1 the
jewelry.  *Id.*  CHS-1 bought some of the jewelry--later
identified as stolen from Antony Jewelers--for $29,000.  *Id.*

2.   Wiretaps

On April 16, 2013, Judge Catherine C. Blake, U.S. District Judge for the District of Maryland, authorized wiretaps on two cellular telephone numbers used by E. Rakhamimov, 443-220-5356 ("Target Telephone #1," or "TT1") and 410-591-9884 ("Target Telephone #2," or "TT2").  *See* ECF Nos. 209-1 (Amended Application), 209-2 (Amended Affidavit in Support of the Application), 209-3 (Amended Order).  From April 17, 2013 to May 17, 2013, the government intercepted wire transmissions over TT1 and TT2.  ECF No. 209 at 38.  On May 31, 2013, and July 2, 2013 Judge Blake authorized 30 day extensions on the TT1 wiretap. *Id.*[20]  On July 23, 2013, Judge Blake authorized a wiretap for cellular telephone number 443-939-4877 ("Target Telephone #3," or "TT3"), used by Yelizarov.  *Id.* at 39.  Interception of TT3 ended on August 22, 2013.  *Id.*

3.   Searches, Seizures, and Statements

On December 11, 2013 officers executed a search warrant at N. Zakharyan's home.  ECF No. 156.[21]  During the search, officers

---

[20] The government had not sought renewal for the TT2 wiretap. ECF No. 209 at 38.

[21] N. Zakharyan apparently lived at 5001 Hollington Drive, Unit 105, Owings Mills, Maryland 21117 ("5001 Hollington Drive"). ECF Nos. 156 at 1; 209-5 at 65.

seized nine master cases of Davidoff cigarettes[22] lacking tax
stamps and $1,500 in cash.  ECF No. 209 at 17.  N. Zakharyan
arrived home during the search,[23] was arrested, and transported
to the FBI Baltimore field office in Woodlawn, Maryland.  *Id.*[24]

At the field office, N. Zakharyan was placed in a room
where he was interviewed by Detective J. Connors and Special
Agent Stacey Bradley; he was not handcuffed or shackled, and
neither officer had service weapons on them during the
interview.  Rough Hr'g Tr. at 28:9-10; ECF No. 209-8 at 1.[25]
Detective Connors read N. Zakharyan his *Miranda* rights and
presented him with a *Miranda* waiver form.  Rough Hr'g Tr. at
29:4-16.  N. Zakharyan stated that he understood his rights but

---

[22] CHS-1 had only supplied to E. Rakhamimov Marlboro and
Parliament brand cigarettes.  ECF No. 209 at 11 n.12.  Before
this investigation, A. Zakharyan had trafficked Davidoff
cigarettes; after the investigation began, A. Zakharyan shipped
Davidoff cigarettes and brands supplied by CHS-1 to New York.
*Id.*

[23] N. Zakharyan returned home from the hospital where he had been
visiting his father.  Rough Hr'g Tr. at 34:17-22.

[24] N. Zakharyan was taken to the FBI field office because the
operation had been a joint investigation of the FBI and BCPD.
*Id.* at 35:6-12.  The interview was not audio- or video-recorded.
*Id.* at 36:24-37:18.

[25] Detective Connors did not offer N. Zakharyan anything to eat
or drink during the interview, nor had N. Zakharyan been offered
anything in the 10 to 15 minutes before Detective Connors
arrived.  *Id.* at 335:19-36:2.

did not sign the waiver form.  *Id.* at 29:16-24.[26]  However, N.

Zakharyan continued to answer questions.  *Id.* at 30:3-7.  He

appeared calm and relaxed.  *Id.* at 30:19-20.  After reviewing N.

Zakharyan's telephone numbers, email addresses, and employment,

Detective Connors mentioned the hookah pipe and large quantity

of cigarettes found at his home.  *Id.* at 31:9-22.  Detective

Connors asked N. Zakharyan why he had that many cigarettes, to

which N. Zakharyan responded, "I smoke a lot."  *Id.* at 31:21-

24.[27] N. Zakharyan's "demeanor quickly changed from relaxed to

somewhat tense."  ECF No. 209-8 at 3.  When Detective Connors

asked him where he got the cases of cigarettes, N. Zakharyan

asked for an attorney, and the interview ended.  *Id*; Rough Hr'g

Tr. at 31:25-32:11.[28]  N. Zakharyan was not threatened or

promised anything.  *Id.* at 38:25-39:9.

---

[26] Pursuant to his regular practice, Detective Connors did not
complete the top portion of the form with N. Zakharyan's name,
age, and date of birth.  *Id.* at 36:6-14.

[27] N. Zakharyan did not appear to be joking when he stated "I
smoke a lot," but rather spoke in a clear, matter-of-fact
manner.  *Id.* at 38:20-24.

[28] Because N. Zakharyan appeared to easily converse in Engligh,
Detective Connors did not ask him whether he understood English.
Rough Hr'g Tr. at 32:16-21.  When Detective Connors inquired
about N. Zakharyan's education, he responded that he had
attended various schools including Drexel College and Baltimore
County Community College.  *Id.* at 32:21-33:1.

B.    Procedural History

On December 3, 2013, N. Zakharyan, and others, were indicted on one count of conspiracy to traffic in contraband cigarettes in violation of 18 U.S.C. § 371 and multiple counts[29] of trafficking in contraband cigarettes in violation of 18 U.S.C. § 2342(a).  ECF No. 1; *see also supra* note 7.  On January 17, 2014, N. Zakharyan was arraigned and pled not guilty.  ECF No. 94.

On December 19, 2014, N. Zakharyan moved to suppress statements and tangible and derivative evidence from the search of his home pursuant to a search warrant, ECF Nos. 155, 156.[30] At the April 2, 2015 motions hearing, N. Zakharyan adopted A. Zakharyan's motion to dismiss the indictment because of outrageous government conduct.  *See* Rough Hr'g Tr. at 25:17-21; ECF Nos. 163 (motion), 165 (memorandum in support of motion).[31]

---

[29] The original indictment charged N. Zakharyan with nine trafficking counts.  ECF No. 1 at 13-14.

[30] At the motions hearing, N. Zakharyan withdrew his motion for severance from co-defendants.  Rough Hr'g Tr. at 25:6-8; ECF No. 157.  As he is the only defendant going to trial, that motion will be denied as moot.

[31] At the motions hearing, N. Zakharyan also orally adopted Y. Rakhamimov's motion to disclose CHS-1's identity and A. Zakharyan's reply thereto.  Rough Hr'g Tr. at 25:9-12.  However, on April 7, 2015, the parties informed the Court about their agreement to resolve that motion.  Accordingly, the oral motion to disclose CHS-1's identity will be denied as moot.

On March 2, 2015, the government opposed N. Zakharyan's
motions. *See* ECF No. 209 (consolidated motions response).[32]

On March 10, 2015, N. Zakharyan was charged in a
superseding indictment that removed charges against co-
defendants and increased the number of counts of trafficking in
contraband cigarettes. ECF No. 214 at 12-13.[33]

On April 2, 2015, N. Zakharyan was arraigned on the
superseding indictment and pled not guilty to all counts. ECF
No. 242. That day, a motions hearing was also held. ECF No.
243. Detective Connors testified about N. Zakharyan's custodial
statement. Rough Hr'g Tr. at 26:10-39:11. The government
submitted two exhibits: a blank "*Miranda* Rights Waiver Form 14,"
Gov. Hr'g Ex. 1, and a June 25, 2008 press release by the New
York State Department of Taxation and Finance about an unrelated
contraband cigarette trafficking operation, Gov. Hr'g Ex. 2.[34]
Later, the government supplemented its exhibits to include
Attachment G-2 to the search warrant affidavit, which lists the
items to be seized from N. Zakharyan's home. *See* ECF No. 249.

---

[32] However, the government has not opposed the procedural aspects
of the Defendants' motions to adopt co-defendant's motions.

[33] The superseding indictment charges N. Zakharyan with ten
trafficking counts. ECF No. 214 at 12-13.

[34] *See also* ECF No. 248 (exhibit list).

II.   Analysis

    A.   Motion to Dismiss the Indictment

N. Zakharyan argues[35] that the government engaged in
outrageous conduct when it induced medical billing fraud
suspects to traffic in contraband cigarettes; the government
thus allowed large quantities of low-cost cigarettes to enter
the market without regard for public health.  ECF Nos. 163, 165
at 10-23.[36]  The government argues that the contraband cigarette
operation was reasonable and necessary to assess the scope of
criminal conduct committed by the Yusufov family and their
associates, and public health considerations are not
appropriately considered "under the rubric of individual due
process rights."  ECF No. 209 at 27-31.

    Although alluded to in *Rochin v. California*, 342 U.S. 165,
172 (1952), dismissal on the basis of outrageous government
conduct originated in *United States v. Russell,* 411 U.S. 423
(1973).  In *Russell,* the criminal defendant argued outrageous
government conduct when an undercover agent supplied narcotics

---

[35] N. Zakharyan orally adopted this motion at the hearing.  Rough
Hr'g Tr. at 25:18-21.  The arguments, however, are from Y.
Rakhamimov's motion and supporting memorandum, ECF Nos. 163,
165.

[36] Although the memorandum in support of this motion briefly
discusses the entrapment defense, ECF No. 165 at 11 n.4, the
motion is not based on entrapment, *see* ECF No. 232 at 1, which,
as the government notes, is a defense not appropriately raised
until trial, *see* ECF No. 209 at 18.

manufacturers with a legal, but difficult to obtain, chemical

that was essential to manufacturing methamphetamine. *Id.* at

431. After rejecting the defendant's claim of entrapment, the

Supreme Court also denied a Due Process claim, explaining:

> [w]hile we may some day be presented with a situation
> in which the conduct of law enforcement agents is so
> outrageous that due process principles would
> absolutely bar the government from invoking judicial
> processes to obtain a conviction, . . . the instant
> case is distinctly not of that breed.

*Id.* at 421-32 (internal citation omitted). Application of

this constitutional theory was limited in *Hampton v. United*

*States,* 425 U.S. 484 (1976). In *Hampton,* a government informant

allegedly sold heroin to the defendant, who later sold it to

government agents. Although acknowledging that "the Government

. . . played a more significant role in enabling petitioner to

sell contraband in this case than it did in *Russell,*" *id.* at

489, the Court rejected the defendant's claim that his due

process rights had been violated, *id.* at 490, stating:

> [i]f the result of the governmental activity is to
> implant in the mind of an innocent person the
> disposition to commit the alleged offense and induce
> its commission, the defendant is protected by the
> defense of entrapment. If the police engage in illegal
> activity in concert with a defendant beyond the scope
> of their duties the remedy lies, not in freeing the
> equally culpable defendant, but in prosecuting the
> police under the applicable provisions of state or
> federal law.

*Id.* at 490 (plurality opinion) (internal citation omitted).

Citing *Hampton,* the Fourth Circuit has since held that the

"outrageous conduct" doctrine "survives in theory, but is highly circumscribed." *United States v. Hasan,* 718 F.3d 338, 343 (4th Cir. 2013).[37]  To offend due process, government conduct must violate a protected right of the defendant, and "must be 'shocking,' or 'offensive to traditional notions of fundamental fairness.'"  *Id.* at 342-43 (*quoting United States v. Osborne,* 935 F.2d 32, 37 (4th Cir. 1991)).[38]

The government likens the contraband cigarette operation here to the undercover operation approved in *Hasan.*  ECF No. 27 at 62.  In *Hasan,* as part of a long-term investigation into an alleged contraband cigarette trafficking ring, undercover agents sold almost 40,000 cartons of untaxed cigarettes to members of the conspiracy, including the defendant.  718 F.3d at 340.  The cigarettes were bought from undercover agents in Virginia and transported to New York for sale.  *Id.*  The Fourth Circuit affirmed the defendant's conviction on grounds that Congress had authorized "commercial endeavors in the context of undercover

---

[37] Indeed, the Fourth Circuit has never held, in a specific case, that the Government violated a defendant's rights through outrageous conduct.  *Hasan,* 718 F.3d at 343.

[38] In formulating the Fourth Circuit test, the *Osborne* court noted that federal appellate courts have demonstrated a "high shock threshold" in response to "extremely unsavory government conduct."  935 F.2d at 36.  For example, *Osborne* cited with approval *United States v. Simpson,* 813 F.2d 1462 (9th Cir. 1987), wherein the Ninth Circuit affirmed the conviction on various drug charges of a defendant who had provided heroin in exchange for sexual favors from a woman who had been manipulated into her conduct by the FBI. *See id.*

investigations,"[39] and the "mere" sale of "untaxed cigarettes

[did] not render [the] investigation outrageous." *Id.* at 344.

N. Zakharyan distinguishes *Hasan* on the grounds that, here, the

government "created the [contraband cigarette trafficking] ring

out of whole cloth," and *Hasan* did not address public health

concerns arising from the distribution of low-cost contraband

cigarettes. ECF No. 165 at 10; *see also* Rough Hr'g Tr. at 41:1-

17.[40]

    *Hasan* did not explicitly rest on the prior existence of the

contraband cigarette trafficking ring; instead, the Court

focused on whether the supply of contraband was outrageous.

---

[39] *See* Departments of State, Justice, and Commerce, the Judiciary
and Related Agencies Appropriations Act of 1992, Pub. L. No.
102-395, § 102(b)(1)(B), (D) (authorizing the FBI to establish
"business entities as part of an undercover investigative
operation," and authorizing "proceeds from such undercover
operation [to] be used to offset necessary and reasonable
expenses incurred in such operation"), cited in *Hasan*, 718 F.3d
at 344.  The Fourth Circuit also rejected the defendant's
argument that Congress, through the Contraband Cigarette
Trafficking Act ("CCTA"), 18 U.S.C. § 2341, *et seq.*, had
impliedly prohibited government agents from distributing
contraband cigarettes, because "unstamped cigarettes . . . in
the possession of federal agents (in the course of their
official duties) . . . are not 'contraband' as a matter of law."
*Id.* at 344.

[40] N. Zakharyan also distinguishes *Hasan* on the basis that the
"argument made and rejected in *Hasan* was that the government did
not have legal authority to distribute such a quantity of
untaxed cigarettes." ECF No. 165 at 10; *see also supra* note 39.
However, *Hasan* clearly addressed whether the operation itself
was outrageous. *See Hasan*, 718 F.3d at 344 ("There is also no
merit to Hasan's claim that [Alcohol, Tobacco, and Firearm]
agents in this case otherwise engaged in behavior that is
'offensive to traditional notions of fundamental fairness.'").

Borrowing from its previous opinions, the *Hasan* court observed
that:

> '[o]utrageous is not a label properly applied to
> conduct because it is a sting or reverse sting
> operation involving contraband,' . . . 'Justice
> Powell's concurrence in *Hampton* recognized that the
> practicalities of law enforcement sometimes compel
> officers to provide supplies to drug manufacturing
> operations, or even to supply 'contraband itself,' and
> suggested that due process does not necessarily
> prohibit use of these and similar investigative
> techniques.'

*Hasan*, 718 F.3d at 344 (*quoting United States v. Goodwin*, 854

F.2d 33, 37 (4th Cir. 1988); *United States v. Milam*, 817 F.2d

1113, 1116 (4th Cir. 1987))(internal citations omitted).  Thus,

it is far from certain that *Hasan* would have been resolved

differently had undercover agents supplied contraband cigarettes

to persons who had not previously trafficked in them.

Here, there was a reasonable basis for the FBI's

investigation.  In 2006 the BCPD and FBI began investigating

Europe Restaurant for receiving stolen goods, distributing

cocaine, and firearms possession.  In 2009, the BCPD received

information from two concerned citizens and CI #5631 that S.

Yusufov--through Healthway Pharmacy--had sold illicit Russian

drugs obtained from New York-based suppliers and committed

healthcare fraud.

Further, after becoming acquainted with CHS-1, S. Yusufov

expressed willingness to engage in criminal activity, telling

CHS-1 they could make "extra money" from CHS-1's purported

export activities or from engaging in "an easy fraud scheme"

involving prescription drugs.[41]  When CHS-1 mentioned that he

dealt in alcohol and cigarettes, S. Yusufov immediately offered

to introduce him to a "connected" figure in Baltimore's Russian

community.  A few days later, S. Yusufov told CHS-1 that E.

Rakhamimov had buyers for contraband cigarettes and alcohol and

wanted to arrange a meeting between them the next day.

Thereafter, S. Yusufov introduced CHS-1 to another prospective

buyer.  Thus, the undercover operation was not "an

indiscriminate government fishing expedition"[42] targeting

innocent persons or those who lacked connections to a criminal

network.[43]  A government informant presented a criminal

---

[41] Later, S. Yusufov had suggested a scheme involving bottled
water and offered to introduce CHS-1 to a dealer of counterfeit
or stolen watches.

[42] *United States v. Hunt*, 749 F.2d 1078, 1087-88 (4th Cir.
1984)(affirming conviction of former North Carolina state judge
on charges that included accepting bribes and racketeering when
he had been pursued by an undercover FBI agent investigating
judicial corruption).

[43] *Cf. United States v. Lard*, 734 F.2d 1290, 1296-97 (8th Cir.
1984)(reversing conviction on entrapment grounds but noting that
government conduct approached outrageousness meriting dismissal
on due process grounds when "it was aimed at creating new crimes
for the sake of bringing criminal charges against [the
defendant], who, *before being induced, was lawfully and
peacefully minding his own affairs*")(emphasis added); *United
States v. Twigg*, 588 F.2d 373, 380-81 (3d Cir. 1978)(reversing
conviction on due process grounds when the government found a
location for a speed-manufacturing operation and provided almost

opportunity to S. Yusufov (and his associates), which he not

only accepted, but insisted on pursuing when faced with a

delay.[44]   This circumstance is neither "shocking" nor "offensive

to traditional notions of fundamental fairness." *Osborne*, 935

F.2d at 37 (internal quotation marks omitted).[45]

---

all the supplies, including "the indispensable ingredient,
phenyl-2-propanone," its informant led the operation and
"furnished all of the laboratory expertise," and the defendants
lacked the knowledge to manufacture the drugs without the
informant and provided "minimal" assistance); *United States v.
Batres-Santolino*, 521 F. Supp. 744, 750-51 (N.D. Cal. 1981)
(reversing conviction when defendants were "obvious novices" who
"had never imported cocaine before, and had no foreign source of
supply of their own whatsoever"). In addition to *Lard* and
*Twigg*, A. Zakharyan argues that this case is like *Greene v.
United States*, 454 F.2d 783 (9th Cir. 1971) (reversing
convictions for possession of unregistered distilling apparatus
and sale without stamp of distilled spirits when the government
involved itself in, and maintained, the operation). *See* ECF No.
165 at 12. *Greene*, however, has been impliedly overruled, *see
United States v. Haas*, 141 F.3d 1181 (9th Cir. 1998) (Greene,
"which may be an entrapment rather than an outrageous government
conduct case[, . . . predates *Russell* and *Hampton*, so does not
reflect the current law of the circuit on outrageous government
conduct"), and did not apply the strict standard the Fourth
Circuit applies to claims of outrageous government conduct.

[44] *Cf. Hunt*, 749 F.2d at 1087-88 ("Nor are we presented with a
situation where a defendant firmly refused a proposed payoff,
and thereafter was incessantly hectored by government agents to
reverse his decision.").

[45] *Cf. Patterson v. United States*, No. 3:14-CV-00342-MOC, 2014 WL
6390994, at *2-3 (W.D.N.C. Nov. 17, 2014) *adhered to on
reconsideration*, No. 3:14-CV-00342-MOC, 2014 WL 6769620
(W.D.N.C. Dec. 1, 2014) (defendant, who had "a history of violent
criminal activity," was provided "with an opportunity to commit
another violent criminal act").

The Court is not persuaded by N. Zakharyan's argument that public health considerations render the government's conduct outrageous. Although, as N. Zakharyan contends, the effect of an undercover operation on the public is a reasonable consideration,[46] the test this Court must apply is whether the government conduct in question was "shocking" or "offensive to traditional notions of fundamental fairness." N. Zakharyan attempts to shock the Court's conscience by asserting that the contraband cigarettes supplied by the government caused almost 400 premature deaths. ECF No. 232 at 14.[47] The Court is mindful

---

[46] See ECF No. 232 at 9 (citing Hampton, 425 U.S. at 493 n.4 ("Governmental investigation involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction.")(internal quotation marks and citation omitted)). N. Zakharyan also notes that, after the infamous "Fast and Furious" operation, the U.S. Department of Justice, Officer of the Inspector General ("OIG"), has required law enforcement to consider risks to public safety posed by an investigation and its maintenance. Id. Though sound, OIG's policy is not binding on this Court.

[47] To calculate that figure, A. Zakharyan relies on the testimony of Thomas Frieden, M.D., the current Centers for Disease Control director, in City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966(CBA), 2009 WL 2612345, at *24 (E.D.N.Y. Aug. 25, 2009). The plaintiffs in Golden Feather had sought injunctive relief barring the sale of untaxed cigarettes from the Poospatuck Indian Reservation in New York City. Dr. Frieden testified that the untaxed, low cost cigarettes prevented people from quitting smoking. Id. at *24. Had those cigarettes been fully taxed, according to Dr. Frieden, the decrease in consumption would have prevented hundreds of premature deaths. Id. Relying on Dr. Frieden's testimony, the Court held that the plaintiffs had established the irreparable harm necessary for injunctive relief. Id. at *41.

of the risks of cigarette smoking; however, the highly attenuated connection between the undercover operation and the purportedly smoking-related deaths--and the lack of evidence thereof--do not convince the Court that the government conduct was sufficiently shocking as to bar prosecution. As noted above, courts have a "high shock threshold,"[48] and have upheld undercover operations involving "substantial quantities of government supplied contraband" when, as here, the investigation targeted distributors.[49]

Also, neither the volume of contraband cigarettes supplied by the government nor the duration of the operation is outrageous. The Fourth Circuit has previously declined to hold government conduct outrageous when "it has enough evidence to seek an indictment for some crime, [but] opts instead to wait in favor of continuing its investigation," and opined that "[d]ue process requires no such ruminations" about the government's motive for continuing the investigation. *United States v. Jones*, 18 F.3d 1145, 1155 (4th Cir. 1994)("[W]e find it not outrageous for the government to continue to purchase narcotics

---

[48] *Osborne*, 935 F.2d at 36.

[49] *See, e.g.*, *United States v. Santana*, 6 F.3d 1, 5 & n.1 (1st Cir. 1993)(reversing district court's dismissal of the indictment when the government supplied, and did not recover, 13.3 grams of heroin--equaling about 2,500 street doses--while targeting a network capable of distributing 200 kilograms of heroin per month).

from willing sellers even after a level of narcotics relevant
for sentencing purposes has been sold."). N. Zakharyan's oral
motion to dismiss the indictment for outrageous government
conduct will be denied.

B.   Motions to Suppress

1.   Search and Seizure

N. Zakharyan challenges the search of 5001 Hollington
Drive. ECF No. 156. He argues that the agents' reliance on the
search warrant was unreasonable, and that they exceeded the
scope of the warrant when they seized items neither in plain
view nor which would have inevitably been discovered. *Id*. at 1-
2. The government argues that the search warrants were
supported by probable cause, and that--even if probable cause
was lacking--the agents relied on the warrants in good faith.
ECF No. 209 at 52-57.

The Fourth Amendment prohibits unreasonable searches and
seizures, and no warrant may issue without probable cause. U.S.
Const. amend. IV. There is probable cause for a search when
there is a "fair probability that contraband or evidence of a
crime will be found in a particular place." *Gates*, 462 U.S. at
238. Probable cause does "not require officials to possess an
airtight case before taking action," and officers "must be given
leeway to draw reasonable conclusions" from information. *Taylor
v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993).

In reviewing the probable cause determination, "[the Court] accord[s] great deference to the issuing judge's assessment of the facts presented." *United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the [judge's] decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). In addition to the probable cause requirement, a valid warrant must be issued by a "neutral and detached magistrate" and must state with particularity the place to be searched and the items or person to be seized. *See* U.S. Const. amend IV; *United States v. U.S. Dist. of Mich.*, 407 U.S. 297, 316 (1972).

Under the "good faith" exception, when officers rely on a facially valid warrant and the supporting affidavit is later found to lack probable cause, the evidence seized is not subject to the exclusionary rule and is admissible in the government's case in chief. *United States v. Leon*, 468 U.S. 897, 913 (1984). The evidence will be suppressed only if (1) the issuing judge was misled by information that the affiant knew or should have known was false, (2) the judge "wholly abandoned" his or her neutral role, (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or (4) the warrant is so facially

deficient that no reasonable officer could presume it to be valid. *Id.* at 923.

The sealed affidavit in support of the search warrants provides a detailed description of the operation before stating the affiant's basis for believing that contraband or evidence of a crime would be found at each location to be searched. *See* ECF No. 209-5 at 7-25, 65-69. The affidavit states that N. Zakharyan had been present during deliveries of the contraband cigarettes and had been observed concealing and loading the cigarettes for transportation to New York. *Id.* at 65. Telephone calls between E. Rakhamimov, I. Rakhamimov, and A. Zakharyan suggested that N. Zakharyan had prepared lists of recently delivered cigarettes, and stored some of the cigarettes at his home.[50] N. Zakharyan operates a business, "Moon Rock LLC," which, according to its articles of incorporation, "serve[s] and sell[s] tobacco products." *Id.* at 65. According to Maryland real property records, N. Zakharyan co-owns 5001 Hollington Drive, Unit 105. *Id.* at 69. Throughout the

---

[50] In one of those calls, a person named "Kolya," whom the affiant believed referred to N. Zakharyan and who was with E. Rakhamimov, was told to "[w]rite [the list] on paper, take a picture, and send" it to I. Rakhamimov. ECF No. 209-5 at 66. In another call, A. Zakharyan told E. Rakhamimov that he needed to take a truck to "Kolya's" house; the next day, I. Rakhamimov mentioned that "[t]here's still some at Kolya's"--apparently in reference to the cigarettes--to which E. Rakhamimov responded, "I loaded them up, brought them . . . there were only six boxes, I think." *Id.* at 67-68.

investigation, N. Zakharyan had been observed coming and going from an attached garage with direct access to Unit 105. *Id.*[51]

The physical surveillance and intercepted communications in the affidavit thus establish a nexus between N. Zakharyan and the contraband cigarette operation, and between the operation and his home. There is "substantial evidence in the record" supporting the judge's decision to issue a search warrant for 5001 Hollington Drive. *See Upton*, 466 U.S. at 728; *Lalor*, 996 F.2d at 1583. For that reason, the warrant is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" under *Leon*, 468 U.S. at 923.

Further, a warrant is facially valid, if "[it] was based on probable cause and supported by a sworn affidavit, and it described particularly the place of the search" and the items to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The warrant in this case meets those requirements. *See* ECF Nos. 209-5; 249. There is no evidence that the issuing judge "abandoned" his or her neutral role in signing the warrant, or that the judge was "misled" by false information. Thus, N. Zakharyan is not entitled to suppression under any of the *Leon*

---

[51] The search warrant authorized the seizure of contraband cigarettes, various records and documents, U.S. currency, safes and strong boxes, indicia of occupancy, cellular telephones, computers, and data security devices. ECF No. 249.

exceptions.[52]  His motion to suppress evidence from the search of his home will be denied.

       2.   Statements

N. Zakharyan argues that any statements he made to law enforcement were obtained in violation of the privilege against self-incrimination and his *Miranda* rights.  ECF No. 155.

*Miranda v. Arizona*, 384 U.S. 436 (1966), requires that the police inform the suspect that he has the right to remain silent and the right to the presence of an attorney before any "custodial interrogation."  *See Miranda*, 384 U.S. at 479.  When a suspect in custody has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

A waiver of *Miranda* rights must be voluntary, knowing and intelligent--though it need not be in writing.  *Moran v. Burbine,* 475 U.S. 412, 421 (1986); *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010)(finding waiver when the defendant declined

---

[52] N. Zakharyan also contends that officers exceeded the scope of the warrant and seized items that were not in plain view, and which would not have been inevitably discovered.  ECF No. 155 at 2.  N. Zakharyan has not stated what those items were or attached supporting exhibits.  Accordingly, his argument must fail.

to sign the waiver form but understood the rights he gave up by speaking to law enforcement).  A waiver is voluntary, knowing, and intelligent if it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.; see also United States v. Cristobal*, 293 F.3d 134, 139-40 (4th Cir. 2002).  The Court engages "in the same inquiry when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause," *Cristobal,* 293 F.3d at 140, that is, the Court asks whether "the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct."  *Id.*

The unrebutted evidence shows that N. Zakharyan understood his *Miranda* rights and waived them by submitting to questioning, was not coerced by Detective Connors or Agent Bradley, and the interview ended when he invoked his right to counsel.  Thus, his motion to suppress statements will be denied.

III. Conclusion

For the reasons stated above, N. Zakharyan's motion to adopt pertinent co-defendant motions will be granted; all other motions will be denied.


_4/9/15_
Date

_____
William D. Quarles, Jr.
United States District Judge